The next case, call for a large number of people v. Taylor. Counsel, whenever you're ready, you may proceed. May it please the Court, Counsel. I'm Edwin Anderson, attorney for Richard Taylor. Mr. Taylor is appealing his conviction for possession of less than 100 grams of methamphetamine on a theory of accountability. Mr. Taylor is an elderly man who is in seriously poor health. The record indicates that he has high blood pressure, diabetes, congestive heart failure, bronchitis, a stretch of pulmonary disease, and narcolepsy. He lives in an old farmhouse outside of Glen Carver. The farmhouse and the farm around it have seen better days. The farm area, I guess, was sort of a nuisance in that there were old vehicles on the property, including an old recreational vehicle that was about 100 yards away from the house. Mr. Taylor, over time, apparently allowed transients to come and go from the property. There was testimony to the effect that he would not treat anybody away if they didn't have a place to stay. It's our argument in this case that the evidence supporting the conviction is simply not worthy of belief, that there's insufficient credible evidence to support the guilty verdict. And we base this on two grounds. All the witnesses that the state brought forward to testify that Mr. Taylor had some knowledge that the meth manufacturing was going on, or that he was in some way sponsoring it, made deals either for themselves or for others, and got deals, were released from jail, had charges reduced, in exchange for telling a story on Mr. Taylor. It's perfectly apparent that the moving party in this case is a woman by the name of Jennifer Leithart. Ms. Leithart set up a deal to help her boyfriend, a man by the name of Bob Brown, get out of jail. We know this because she worked in a convenience store near Mr. Taylor's home until she was fired for drug dealing. And two of her fellow employees, who, so far as we know, have no interest in this case and aren't particularly friends with anybody, testified to having heard Ms. Leithart on the phone saying that she was setting up a deal to get her boyfriend, Bob Brown, out of jail, and she was going to enable the prosecution of Mr. Taylor. In fact, one of those witnesses said she spoke directly with Ms. Leithart, and Leithart admitted that to her. And we do know that Bob Brown testified against Mr. Taylor, and he was subsequently released from his jail sentence. We also know that Ms. Leithart was involved in placing meth material in the recreational vehicle. It's worth noting that there were no fingerprints of Mr. Taylor found in the recreational vehicle, and there was no meth equipment or methamphetamine found upstairs in Mr. Taylor's bedroom, a bedroom which the evidence shows was pretty much the place he stayed all the time because of his illness. Testimony from a number of witnesses was that he was in bed all the time. In fact, he frequently used an oxygen mask, which I assume would have to do with obstructive pulmonary disease. Another friend of Ms. Leithart is a man by the name of Kirk Moser. Moser was facing a Class X charge and had that reduced to a probationary charge and had a probationary revocation charge withdrawn in exchange for his testimony that he was involved in meth making at Mr. Taylor's property and that Mr. Taylor was aware of it. Yet another witness had six months taken off their sentence. In sum, those witnesses all had reasons to lie, were convicted felons not worthy of belief. This is an instance where there's so much mud being thrown at the defendant that it simply obscures the truth that this was an elderly incapacitated man who didn't control his property and was a nuisance, but he wasn't promoting the methamphetamine making ring. We know that Mr. Taylor was on oxygen in bedroom most of the time. Motor home was 100 yards from the house. Nobody reported seeing Mr. Taylor out near the trailer. Mr. Taylor's testimony was he knew people were in the trailer because he thought that the various people who came and went from the property went out there for sexual relations and he didn't really care one way or the other. He wasn't aware that anyone was making methamphetamine in the trailer. Simply put, he didn't control the property. He wasn't aware that people were using it for criminal purposes. I think the point that clinches this as far as knowing that he was too ill to be any criminal mastermind here is that the court clearly knew he wasn't dangerous. The record indicates that by the end of the circuit court proceedings, Mr. Taylor was attending court, coming to court in a wheelchair every time. When he was convicted, the court immediately released him, didn't revoke the bond. It wouldn't enter a minimus on him when it sentenced him and granted him an automatic appeal bond. With the awareness that he was simply too ill to be a danger to anybody, whether or not he was criminally culpable. So that's our first argument, that we ask this court to reverse the conviction on the basis of insufficient evidence. Should this court decline to do that, in the alternative, we would ask that the court remand the case for resentencing in consideration of probation. We do this based on the argument that counsel who represented Mr. Taylor in the circuit court had a per se conflict in representing him in the sentencing hearing and in the motion to reconsider sentence. The case was originally charged as possession of over 900 grams of methamphetamine and a negotiation was made in which Mr. Taylor waived his right to jury trial and the charges were lower to less than 100 grams. There was some indication that it was understood that the offense would be non-probationable. When we get to sentencing, there's no argument made in the sentencing hearing regarding probation. Mr. Taylor filed a per se motion to reconsider in which he said, I wouldn't be able to ask for probation. I knew that they said that my attorney wouldn't argue for probation, but I thought I could argue for it and I wanted to be able to do that. The attorney filed a motion to withdraw, or he said, he did file a motion, he said in court, I need to withdraw as counsel because I took probation off the table and now Mr. Taylor thinks he should be able to get it. The court didn't let him withdraw and had him actually sign Mr. Taylor's pro se motion. In what capacity? I didn't quite understand that. It was a pro se, but he was deciding. I guess to adopt that motion as his own. Was he allowed to modify it or anything? No, it wasn't modified. He just signed it. And then in the hearing, I don't believe counsel actually argued for probation. He let Mr. Taylor speak on his own behalf in favor of it. It's my contention that he's put in a situation where he is a per se conflict. He's going to have to argue that I led my client to waive a right, the right to a jury trial, where I understood that probation would not be considered as part of the deal. My client didn't know that. He made an unknowing waiver of his right to a jury trial. I did that, and now I have to argue, if I'm going to argue that my client should get probation, I'm going to have to argue that I am ineffective for having caused him unknowingly to waive that right. If he's got to argue his own ineffectiveness, that's a per se conflict. The court should have appointed another attorney to represent him in the hearing when the motion is reconsidered. Or, I guess, short of that, he could appoint an attorney to do a premise kind of a look at what actually happened and should an attorney have insisted on withdrawing. So I would argue that in this instance, we have a per se conflict, which requires a different attorney on the motion to reconsider, and we'd ask the court to vacate the sentence, or I'm sorry, remand the case for reconsideration of the motion to reconsider the sentence with a new attorney. So, Your Honor, we ask that you reverse the conviction. Thank you, Your Honor. Counsel? May it please the Court? Counsel? My name is David Sanchez. I'm here on behalf of the people. This case presents to this Court two issues. Whether the trier of fact, which in this case was a judge and it was a bench trial, whether he had before him all information he needed to properly weigh the evidence and determine the credibility of the state's witnesses. And second, whether defense counsel labored under a per se conflict of interest when he presented the defendant's motion to amend his sentence. The first issue comes under the claim of insufficiency of the evidence. In Illinois, determining the weight of the evidence and the credibility of the witnesses is uniquely within the province of the trier of fact. Here, all the infirmities in witness testimony were explored during the evidentiary portion of the trial, and these infirmities were subject to cross-examination. Indeed, defense has not pointed to anything that was not known to the judge during the bench trial, which did not come out during the evidentiary portion of that trial. Second, the witnesses provided corroborative testimony. The defendant's conviction did not rest on the exclusive testimony of any single witness. The infirmities in witness testimony were pointed out by defense counsel to the trial court in opening and closing arguments. And lastly, when the trial court issued his ruling, he expressly stated that he was aware of the problems with these witnesses. He took them into consideration. He weighed the evidence, and he still came out determining that the defendant was guilty of knowing possession of methamphetamine. Now, what was the volume on that, knowing of possession of less than 100? I'm sorry? What was the volume, less than 100? It was less than 100. That was the finding? Yes. Yes, that was what he was charged. That was the... Amended charge. Amended charge, and that was what the judge convicted him on. Well, see, I was kind of thinking, couldn't you always then overcharge so that you get probation off the table? Wouldn't that be a good way of handling it? I mean, if you're a prosecutor. If you... Less overcharge, then we'll get probation off the table. Well, the facts of this case show that the two officers who found the meth lab in the RV... Okay, and how much volume did they find? They found well over 900 grams. And that's in the liquid form? In liquid form, yes. Which is in almost every case. I'm not... I mean, more than 100, anyhow, because of Beaker. But they found, yeah, just the... It wasn't cooked down. Substances containing methamphetamine, which is what they found in the RV. And it was, I think, one weighed over 3,000 grams, another weighed another 3,000 grams, and another weighed, similarly, more than 3,000 grams. I mean, we're talking much more than 900 grams. So there was a basis for the original charge before it was amended. So the judge found that the defendant was in knowing possession of less than 100 grams of methamphetamine. And the evidence overwhelmingly supported this conviction. Now, in a case involving meth... Well, let's go back to the evidence. I thought the only evidence they had was that he might have owned that extension cord that went out to the RV. And he owned the RV and the land, no doubt about that. Yeah. And the extension cord. But is there anything else to tie him to the RV? Any other evidence? Like, you don't have fingerprints. There's no fingerprints. Then you don't have anybody ever saw him there. No one saw him in the RV. Or even near it. I don't think it's the State's theory of the case that the defendant was personally making methamphetamine. The State's theory was that he was in possession on an accountability theory of liability. So he was the one who was authorizing his RV to be used for the manufacture of methamphetamine. He was the one who was giving money to Kirk Mosier and to Robert Brown to go out and purchase materials to manufacture meth. He was the one who told Kirk Mosier that he had to move the meth lab out of the basement of the property and put it in the RV. So there's all that evidence which certainly suggests that he was guilty on a theory of accountability. And like I said, he was the one who was in charge of the property. When the cops had a problem with the property, they would go to the house, they would talk to the defendant. Mosier and Brown, who were the two cooks, they would have to get permission. When they first came to the house to use it to manufacture meth, they went to the defendant and asked for permission to use the basement. Mosier testified that the defendant was the one who ran the house. The defendant at one point ordered Mosier to clean the RV. And defendant's own testimony showed that Leithart at some point came to him asking for permission to use the RV. Now, of course, he didn't say that she came to him asking to use it for methamphetamine manufacturing. But the point is that people had to go to the defendant to use this RV and he had control over it. He was also not so bedridden that he was entirely confined to his room. There was evidence that he was walking around the police station after he was arrested. There was evidence that he was downstairs at certain points. There was evidence that he worked on his cars at certain points. And so he wasn't entirely bedridden. Now, there is plenty of evidence to suggest that he did have health problems. He wore an oxygen mask when he went to bed at night. I'm not saying he was spry. He was most likely confined to his bed for the majority of the day. But didn't say he was like 345 pounds or something like that. I'm not. I saw that. But he might have been overweight as well. He had health problems. But that doesn't mean that he didn't know what was going on. Well, is there anything in the record that indicates? I mean, you basically got a proposition here. This defendant is acting as an overlord of a meth kingdom. To what benefit to him? Is there anything in the record that indicates what he was getting out of this by allowing use of the property or the production of meth? In Jennifer Lizard, Kirk Mosier and Robert Brown all testified that the defendant would consume methamphetamine. Ricky Flatt testified that Kirk Mosier had to give the defendant half of whatever methamphetamine he manufactured. So I don't know. There's nothing in the record to suggest the defendant was getting money from the sale of methamphetamine. But there is, in the record, evidence that suggests that he was consuming it at certain points. He also told Jennifer Lizard that he had been prescribed methamphetamine back in the day for narcolepsy. So he did have, there is evidence suggesting that he had some motivation for having this methamphetamine manufactured on his property. Now, that sums up the sufficiency of the evidence argument. Is there any more questions about that sectional? I believe so. Okay. Now, with respect to the second issue, which is whether the defense counsel is laboring under a per se conflict of interest, the defense attorney in this case was not laboring under a per se conflict of interest. The Illinois Supreme Court, People v. Fernandez, has identified three situations in which a per se conflict of interest arises. Now, suffice to say, a defendant claiming that his counsel was ineffective is not one of those situations. This court should not identify a fourth situation where, especially here, where the allegation was entirely without merit. Moreover, People v. Perkins holds that a per se conflict of interest is not created by the mere filing of a pro se motion alleging counsel's ineffectiveness, and a court is not required to appoint new counsel. Rather, new counsel will be appointed where the underlying allegations show possible neglect of the case. Here, there was no possible neglect of the case, and there can be no prejudice because in no circumstance could probation be argued at sentencing. Say the deal was undone, and they didn't proceed under this lesser charge in which the defendant was facing a lesser minimum and maximum sentence. Say they proceeded under the original charge. Well, that's an enhanced class X felony, and he wouldn't be able to argue probation. That wouldn't even be on the table. So either he proceeds under the original charge or he proceeds under this new deal. Under the new deal, he's facing a lesser sentence, but as part of that, defense counsel is not permitted to argue probation. So there can be no prejudice. With that said, the people respectfully request that this court affirm. So you're basically saying under either charge, prior to the limited agreement or subsequent to the agreement, probation is off the table? Yes. Okay. Thank you, counsel. Counsel? To address that last point, if, in fact, probation is off the table, and that's the understanding that was reached, apparently Mr. Taylor did not know that it was completely off the table and he wages right unknowingly. Do you agree with counsel that under the original charge, probation was off the table? Well, based on the charge, the defendant got probation there, but it was reduced an amount. And to that end, the question about what the status of the lab equipment, the materials found in the RV, State Police Officer King, who searched the RV, determined that he testified that the combination of things found in the RV amounted to an operational meth lab that was not in production. The testing that they did of the amount that was collected showed 37.1 grams of liquid. If there were other bottles and things collected, we didn't get testimony about that at this trial. You can presume that there probably was, since it was charged as over 900 originally. But did they test those? Were there any evidence that they contained a substance? I don't recall that. I can't say for certain that there isn't a recording that shows. But they took a sample, and that sample is what they tested, and that's what they charged on in this instance was the amount, that 30.7 grams that they sampled and tested. But they couldn't have made the X charge with that. Well, they had to see something else in the indictment that was greater than 37. whatever grams. Right. Well, and that's when they originally charged them as the over 900. Yes. I assume they were going to go on the basis of, well, there were these jugs that had liquid in them. I wanted to just wrap up the thought on the per se conflict. But if they had jugs that had liquid in it, that liquid would have been tested, I would think. Well, I believe the standard is they have that liquid in the jug, they draw amounts out of it, and then they test that amount. Right. And that tested positive for substance? Apparently that's what 30 grams is. But there is that evidence. That's what I wanted to get at. There is that evidence. That's in evidence. Yes, 37 grams, the sample that they tested. But the officer's testimony was that it was a meth lab that was not in production. And I would say that that's consistent with the evidence that Leithart brought in materials from the outside, which is essentially what she admitted to her coworkers. The state indicates that the defendant told Ms. Leithart that he used methamphetamine, and Leithart said she gave him methamphetamine. But again, that isn't Mr. Taylor's testimony. That is Ms. Leithart's story, which we know she has a motive to produce because she wants her boyfriend, Bob Brown, out of jail. It's important to note that one of the other things Officer King determined was there was no extension cord from that house to the RV when he was there. Who said that? Officer King, who searched the RV, said he didn't see an extension cord when he was there. Who testified there was an extension cord? I believe Brown and Moser, the meth makers. Of course, Moser said that he was making meth in the house, and the defendant told him to get the material out of the house. Other people said they lived in the basement. They never stole the meth lab. Insofar as the defendant's condition, when confronted with the accusation that he used methamphetamine, he essentially said, if I ever tried that, it would kill me. Look how sick I am. It would kill me if I tried that. I didn't do that. And I would leave this court with the thought that this is a man,  this judge declined to enter the minimus and immediately let him released on bond. This is a case where the state threw so much money against the wall that the truth gets obscured. We don't really see what's going on here. Jennifer Whitehardt had a motive. Her testimony and the testimony of her friends simply is incredible, and we'd ask this court to reverse the conviction. Now, I have a question. You say there was no extension cord. It was just by testimony. Was there ever an extension cord found at the house that would reach the RV? Well, I don't recall that that was something that was evidence in support of the state's case. Whether there were extension cords at the house is possible. I don't know that that would be conclusive of anything in an old farmhouse. But I do know that King did not recall seeing an extension cord leading from the RV to the house. That's at R2. That's the record. And there never was an extension cord admitted into evidence? Not that I'm aware of. We'll look at the record. Thank you, Your Honor. Thank you. Excuse me. We appreciate the grace and argument of the counsel to take the case under advisement.